IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Nos.  11-29 |
| | ) | 11-172 |
| EMERSON WINFIELD BEGOLLY | ) | **(UNDER SEAL)** |

GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Emerson Winfield Begolly is a radicalized Islamic jihadist who dangerously rose to an influential position on an online jihadist forum with the desire to radicalize others and drive them to extreme violence against Americans in the United States.  Begolly proved his bona fides as a person determined to violence when he attempted to shoot FBI agents who attempted to contact him, biting one of them as they attempted to restrain him from reaching a firearm that he had on his person, just as he had exhorted others to do when online. Begolly is a severe danger to the community and his incarceration is imperative for both the safety of the United States as well as his own rehabilitation.  Due to the seriousness of the offense and the consideration of other factors, the parties negotiated in good faith to an agreed-upon sentence of 15 years (180 months) imprisonment.

. This memorandum is meant to supplement that and argues

that as a threshold matter, a sentence of <u>180 months</u> imprisonment is an appropriate sentence for this Defendant and this case, pursuant to the sentencing factors of 18 U.S.C. §3553(a), such that this Court should thus accept the plea agreement of the parties submitted under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in <u>United States v. Booker</u>, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before <u>Booker</u>.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-<u>Booker</u> case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

<u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing <u>United States v. King</u>, 454 F.3d 187, 194, 196 (3d Cir.2006); <u>United States v. Cooper</u>, 437 F.3d 324, 329-30 (3d Cir. 2006)).  <u>See also</u> <u>United States v. Smalley</u>, 2008 WL 540253, *2 (3d Cir. Feb. 29, 2008)

(stating that the Gunter directive is consistent with later Supreme Court decisions).  In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the Booker decision.  United States v. Grier, 475 F.3d 556 (3d Cir. 2007) (en banc).  The failure to properly calculate the advisory guideline range will rarely be harmless error.  United States v. Langford, 2008 WL 466158, *8-11 (3d Cir. Feb. 22, 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." Cooper, 437 F.3d at 329.  See also Rita v. United States, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006).

In this case, the parties have agreed that the analysis above supports an agreed-upon sentence of 180 months, or 15 years, imprisonment, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure (F.R.C.P.).  Pursuant to Rule 11(c)(4) and (5) of the F.R.C.P., the Court must weigh the above sentencing factors as part of the sentencing process in determining whether they support the 180 month sentence agreed to by the parties such that the Court should accept the plea agreement.  Should the Court believe the sentencing factors do not support such a sentence, the Court has the option of rejecting the plea agreement, upon which time the Defendant will have the opportunity to withdraw his plea of guilty pursuant to the plea agreement and Rule 11(c)(5)(B).

If the Court accepts the parties' plea agreement, the Court may then entertain

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a sentence in this case of 180 months imprisonment and acceptance of the plea agreement by this Court.

## I.   BACKGROUND

On August 9, 2011, Emerson Begolly pled guilty to Solicitation of a Crime of Violence, namely Arson of Property in Interstate Commerce, Destruction of Communications Lines, Stations, or Systems, and Terrorist Attacks Against Mass Transit Systems, and also to Using and Carrying a Firearm During and In Relation to a Crime of Violence.

The defendant was originally approached by the FBI on January 4, 2011, when it was determined that he went by the identity of "Abu Nancy," an administrator/moderator on the anti-American Islamic jihadist forum known as the Ansar al-Mujahideen English Forum (AMEF), which the Court should have no doubt is a popular international forum known to be attended by authentic Islamic jihadists.  Begolly, as "Abu Nancy," possessed influence on the forum and a persistent theme of compelling other like-minded jihadists to use violence in the name Allah to retaliate for perceived injustices being perpetrated by the United States.  As such, Begolly attempted to radicalize and mobilize individuals who he knew were receptive to his rhetoric based on their very presence on AMEF.

Using divine and moral justification that dangerously resonated with his audience, Begolly collected positive feedback from his followers as he gave specific direction and ideas for how to violently terrorize the American homeland. Besides providing specific direction, such as using propane tanks tied to the front of a truck to create a car bomb or using a prybar to derail trains, Begolly emphasized detail on how to maximize the carnage or focus on specific types of vulnerable victims to enhance the success of the terror.

Begolly escalated his rhetoric when he provided a bombmaking manual to his followers with instructions as to how to hide its possession from law enforcement.

Finally, on January 4, 2011, Begolly proved that he was every bit the violent person he claimed to be, and pushed others to be, when he was approached by agents of the FBI. Begolly, as Abu Nancy, had urged his followers to always be in possession of a loaded firearm, and to be aggressively resistant to any law enforcement contact, because "anything is fair, including trying to bite off fingers, gouge out eyes, or pulling out ears." Upon contact with the FBI, Begolly, who predictably, though illegally, was armed with a loaded pistol at his waist, attempted to reach for it for no other obvious reason than to use it against federal law enforcement. His determination to violence was confirmed when, once subdued by the agents, Begolly continued to struggle by biting

the agents to the point of bleeding in an attempt to get to his firearm.

The defendant entered into a plea agreement whereby the government agreed to dismiss two counts of the Indictments with the effect of "capping" the Guideline range in this case. In the plea agreement, the parties stipulated to a sentence of 15 years imprisonment, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ This sentencing memorandum supplements ██████████.

## II.   <u>SENTENCING CALCULATION</u>.

### A.   <u>Statutory Maximum Sentence</u>.

The maximum sentence that may be imposed on the defendant is life imprisonment, a fine of up to $375,000, and supervised release following a term of imprisonment of up to five years. The statutory minimum term of imprisonment is five years.

### B.   <u>Sentencing Guidelines Calculation</u>.

The Probation Office correctly calculated the defendant's advisory guideline range as a level 30, with a criminal history category of VI, as to Count One of Criminal Number 11-172, for a guideline range of 168-210 months.  Due to the fact that the government has dismissed counts in the Indictment pursuant to the plea agreement, the statutory maximum sentence of 120 months on Count One of Criminal Number 11-172 effectively caps the guideline

range on that count at 120 months imprisonment.  See U.S.S.G. §5G1.2(a).  Pursuant to statute as well as U.S.S.G. §2K2.4(b), the defendant's guideline for Count Three of Criminal Number 11-29 is 60 months, to be run consecutively to any other count.  Thus, the total guideline range for the Defendant in this case is 180 months imprisonment.  This is also the agreed upon sentence of the parties in their plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.

### III.   ANALYSIS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that 15 years, or 180 months, imprisonment is the appropriate sentence in this case,                     .

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v.

United States, 128 S. Ct. 586, 596 (2007).  As will be discussed later, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]

---

[1]  Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter

A.    Consideration of the 3553(a) Factors.

3553(a)(1)-Nature  and  Circumstances  of  the  Offense,
3553(a)(2)(A)- Reflect Seriousness of the Offense, Promote Respect
for the Law, and to Provide Just Punishment for the Offense

Emerson  Begolly  used  the  Internet  as  a bullhorn that
transcended international boundaries, spreading his solicitations
to violence by divine justification to those who he knew were
susceptible to such rhetoric.  In doing so, Begolly made any person
who was within physical proximity of any jihadist recipient of his
message a potential target for extreme violent acts.  To illustrate
just what an amplifier AMEF was, the government has attached the
report and curriculum vitae of Evan F. Kohlmann, who has been
recognized as an expert by various Federal courts around the
country in the field of international terrorism.  See Attachment A.
As Kohlmann's report states, although AMEF was open to any and all
individuals who wanted to read its rhetoric, AMEF was not an "open
microphone" that could be used by anyone.  Rather, the posters on
AMEF carried with them a certain level of credibility based on the
relatively exclusive admissions practice of the administrators of
the  forum.   This  credibility  with  the  jihadist  community was
magnified even more so with the administrators, such as Emerson
Begolly. As an administrator, Begolly was within the inner circle
of those who had "the final say in all matters dealing with the

---

that a judge, having explained why a sentence has been chosen, also
explain why some lighter sentence is inadequate.'"  United States v.
Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v.
Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

forum and its operation." See Attachment A at 5.  The position of "administrator" undoubtedly carried *gravitas* with those on the forum who were looking for direction and justification for jihadist acts, enlarging the dangerousness of Begolly's repeated and specific calls to violence.

As illustrated in Attachment A, AMEF was used as an active recruitment tool by known terrorist groups.  Id. at 6, 8.  Even more dangerous however, was the homegrown radicalization purpose of AMEF.  This purpose was carried out by the Internet to unknown corners all over the world to individuals who might be susceptible to the misguided belief that the religion of Islam legitimately called for violence against the United States and/or non-Muslims. Examples of these susceptible individuals were those such as Barry Walter Bujol, Jr., who tried to leave the U.S. to fight with Al Qaeda while providing restricted military documents, or Colleen Larose, who plotted to kill a Swedish artist who offended Muslims, or Khalid Aldawsari, who plotted to build a bomb to use against American targets.  See Attachment A at 11.  It was to these individuals and unknown numbers of others like them, that Administrator Begolly, known to AMEF users as "Abu Nancy" or "Asadullah AlShishani," exhorted, for example, to "permissibl[y] take and kill hostages...to strike terror into the hearts of the [non-believers]," particularly those near "jewish schools or daycare centers," as he said in July 2010.  See Attachment B.  In an exercise and acknowledgment of his authority within the forum,

-11-

Begolly used an authoritative tense, using words like "can," "may," and "it is permissible." Id. In addition, Begolly would pose questions to himself and provide answers which, again, illustrated his authority on the forum to justify violent acts. An example of this was when Begolly asked himself "what are the reasons" it was "halal [meaning "permissible"] to deliberately target civilians in Jihadi operations [in the United States]," and answered that it was because "the Qur'an commands us to fight the [non-believers] as they fight us." See Attachment B. Further examples of these statements are attached to this memorandum as Attachment B.

Not only did the Administrators on AMEF, including Begolly, know full well that their solicitous messages were being received by like-minded jihadists by virtue of the responses of approval that were logged beneath their various postings, they specifically addressed and cautioned those individuals that they knew were in the forum who were going to violently act on AMEF's radicalization efforts. For example, this knowledge was illustrated when administrators posted to:

> "...caution our members, as we have done many times before from revealing any personal info and from visiting the forum without taking the proper security measures. Know that merely downloading a banned book or a bomb making manual is enough for the authorities to indict the person...Please think many times before you say and do anything related to jihad. ***If you are serious, then there is no need to inform others of your activities and big talk***...will most probably land you in jail. We ask Allah to protect each and every Muslim from the plots of the infidels, especially those who have been guided toward this blessed path of jihad."

See Attachment A at 5.  (emphasis added).  Begolly, for his part, acknowledged the same, when on December 28, 2010, he posted a bomb manual on AMEF and instructed those recipients of his posting to use a flash drive to hide their possession of the manual, and to use caution when building the bombs as instructed in the manual so that he did not read in the news that "Suspected Islamist killed while mixing chemicals for bomb making."

Any weak claim that Begolly's postings were merely bluster from an online persona that was distinct and separate from his true self (a fact incidentally that is irrelevant to either Begolly's guilt for this offense or this Court's weighing of serious nature of the offense itself) was invalidated on January 4, 2011.  On that date, Begolly attempted to draw a loaded firearm on two agents of the FBI who were acting in furtherance of their lawful duties.  In his struggle to avoid arrest or apprehension, Begolly bit the agent's fingers that were on Begolly's hands in an effort to prevent Begolly from getting to his loaded firearm at his waist. Although some may wish this Court to believe that surprise, confusion, and/or Asperger's Syndrome are to blame for the misinterpretation of this wild and dangerous action, Begolly's postings on AMEF firmly belie that assertion as well.  In July 2010, Begolly devoted an entire posting to precisely the circumstance he found himself in on January 4, 2011.  The title of the posting was "Do not let yourself be taken alive."  See

Attachment C.  As illustrated in the posting, Begolly warned of always being prepared for law enforcement contact, including to

> ...be sure there is a gun in a place you can easily reach.  If not a gun, even grab a kitchen knife and lunge at them, and bi'idhni'Allah you could [sic]killed one.  If nothing is handy, say the [sic] attack you while you are in the shower or doing clothes, then it is best to fight with your bear [sic] hands that be taken.  Anything if [sic] fair for you, including trying to bit [sic] off fingers (then you might get a gun), or to gouge out eyes, or to pull off ears.  If you go quitely [sic], it is humiliation and awaiting you is a stretch in jail regardless.

Id.

In fact, it was Begolly who believed (correctly, in this case) that law enforcement was monitoring him and that a confrontation was imminent. In an October 28, 2010 on-line conversation found on Begolly's computer, Begolly (as "Abunancy") wrote that he always had his "AK" next to him, including when he slept, in anticipation for when law enforcement would raid his house. See Attachment D, October 28, 2010 on-line conversation with Khalid at 7:04:03PM et seq.  In the same on-line conversation, Begolly reaffirmed that "i swear to God i will never go to jail," in the context of a law enforcement confrontation. Id. at 7:10:58PM et seq.  On November 22, 2010, Begolly acknowledged in another on-line conversation that he knew he was being watched by law enforcement, but that they were "chicken" to confront him because they "knew [he was] an admin [on AMEF]" and that he was armed.  See  Attachment E, November 22, 2010 on-line conversation with "Hassan" at 8:09:45PM et seq.  Later in that on-line conversation, Begolly stated that "if I had the choice

-14-

between 12 jouors [sic] and 6 palbearers [sic] id [sic] choose the latter any day," in another reference to his solution to an anticipated law enforcement encounter. Id. Begolly proclaims even later in the on-line conversation that "if they came for me, I would make waco look like a tea party." Id. at 8:49:20 PM. Indeed, the fact that Begolly was illegally carrying a loaded firearm in his waist as he sat in the parking lot of a Burger King believing that he was waiting to be taken to see his grandmother is indicative of his ongoing and, in this case, well-founded, anticipation that law enforcement was coming for him based on his online activities for which he was well aware. His possession of the firearm also indicated his intentions as to what he planned to do once that confrontation occurred.

A sentence of 180 months imprisonment, which is the agreed-to sentence by the parties, adequately reflects the utter seriousness of Begolly's crimes and is a just punishment for a crime in which Begolly placed unknown numbers of people at risk through his online solicitations, and also knowing and intentionally placed the lives of two FBI agents at risk (as well as the lives of himself and other bystanders) through his actions on January 4, 2011.

3553(a)(1) - History and Characteristics of the Defendant, 3553(a)(2)(C)- To protect the public from further crimes of the Defendant

The Government has been provided with a report drafted by Dr. Lynn Ross DiMarzio, PhD, from the Defendant, that the Government anticipates will be submitted by the Defendant to the Court. While

the Government emphasizes that which is lightly alluded to by Dr. DiMarzio, that being that Asperger's Syndrome is not to be confused and convoluted with other more debilitating forms of Autism,[2] the Court may properly consider this report as potential grounds for accepting a plea agreement which in fact reduces the Defendant's sentence to 180 months imprisonment, a term that is at least (before any grouping analysis) 4 to 7.5 years below what the advisory guideline range for the charged offenses would have been if the government had not dismissed the other counts of the Indictments pursuant to the plea agreement.[3]   See U.S.S.G. §5G1.2(d).

While the Court should otherwise appreciate Begolly's January 6, 2013 statement to Dr. DiMarzio that he is "glad the Feds got [him]," and that "In the long run, they did me a favor," the Court should apply a good deal of caution when weighing those types of statements against those internet postings and violent actions of

_____

[2]   As Dr. DiMarzio briefly mentions in the report, "the majority of people with Asperger's Syndrome are law abiding citizens, often with very clear and conventional opinions as to what is morally right and wrong." See DiMarzio Report at 23.  Indeed, the Government submits that the record reflects that although Emerson Begolly suffers from Asperger's Syndrome, he is a high-functioning and extremely intelligent individual who appreciated the illegality of his actions while they were occurring.  Dr. DiMarzio rightfully states that "Mr. Begolly's behaviors should [not] be 'excused' because of his Asperger's Disorder." Id. at 20.

[3]   Before engaging in any grouping analysis that additional counts would have necessitated, the two dismissed counts, had they been applied in this case, would have raised the statutory maximum sentence such that the surplus guidelines range of the Solicitation charge (18 U.S.C. §373(a)) would have been applied consecutively under the guidelines procedure set forth in U.S.S.G. §5G1.2(d).

Begolly articulated above from 2010 and 2011, as well as statements of Emerson Begolly made as recently as November 30, 2012, while the Defendant was awaiting sentencing in this matter.  See Attachments F, Transcript, and G, Recording of Emerson Begolly.  In what seems like another furious rant by Begolly on November 30, 2012, Begolly claims that "everybody" wronged him in this matter and that "the world spits on [him], so [he] spit on the world."  Id. at 2. Specifically, and more troubling, is the fact that in reference to his mother's assistance to the FBI in contacting him back on January 4, 2011, Begolly expresses contempt for his mother and an apparent desire to hire a "crackhead" by the name of "Tom Nuttel" to take her "down to Florida" and feed her "to the sharks."  Id. Later, he indicates that "Nuttel" would "rape [his mother] with a hammer, then hit her over the head with it."  Id.  The Government notes here that further investigation has not yielded any additional evidence that Begolly has acted on this articulated desire, but the Government offers this tape merely to show recent information on Begolly's character and conduct that is contradictory to that of someone who is reformed and no longer a future danger to commit additional offenses.  See 18 U.S.C. §3661.

The record reflects that Emerson Begolly has been a person obsessed with violence.  As he stated on November 20, 2010 in an online on-line conversation, "when I wake up in the morning the first thing I think about is killing...seriously I think about killing all the time"  See Attachment H, November 20, 2010 on-line

conversation transcript at 1:46:18 PM.  Despite the fact that Mr. Begolly has been apprehended, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, and has been in custody for over 2 years, the recording of November 30, 2012 indicates that Mr. Begolly's violent obsessions and rhetoric continue to personify him just as they did on the day he attempted to draw a firearm on agents of the FBI on January 4, 2011.  The agreed-upon sentence of 180 months imprisonment ensures that Mr. Begolly will remain under constant monitor for a lengthy term so as to prevent any violent acts being committed or solicited by him either in retribution for his incarceration in this case or for other reasons altogether.

   3553(a)(2)(B)- To afford adequate deterrence to criminal conduct

   Islamic extremism has been an existential threat to the United States of America both overseas, where American soldiers continue to fight against those who would recruit and train others to carry out violent attacks against civilians, and within the United States, where violent extremists, like Begolly, are being grown in society's midst online by other individuals like Begolly.  A weak or light sentence in this case, which will undoubtedly gather a large amount of press coverage and publicity (including to those other extremists who continue to plot against the United States)[4],

---

[4] Evan Kohlmann notes in his report that "following the reported arrest of Mr. Begolly by agents from the FBI in early January 2011, follow users on AMEF posted tributes to him and the extensive legacy

would be extremely detrimental to efforts of the U.S. Government in protecting the people of the United States, as well as to the American people's efforts to be resilient in the face of this threat.  A substantial sentence of incarceration, such as the one agreed to by the parties of 180 months imprisonment in the plea agreement, would send a message of deterrence to those who will undoubtedly be watching how seriously the U.S. Courts deal with this type of violent activity.

3553(a)(2)(D)- To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; 3553(a)(3) - the kinds of sentences available

Despite having agreed to a sentence of 180 months imprisonment, the report by Dr. DiMarzio that will be submitted by the Defendant calls into question the effectiveness that "remain[ing] in federal prison for an extended period of time" would have on assisting "Emerson Begolly in reaching his maximum potential." See DiMarzio Report at 23.  The government does not suggest that Federal prison is the ideal locale for someone to reach their "maximum potential."   However, sentencing and imprisonment must serve other important goals which are laid out in the factors of 18 U.S.C. §3553(a).  In this case, justice and safety of the public demand that he be placed in federal prison for a significant timeframe.  Despite the assertions of Dr. DiMarzio regarding the inadequacy of Federal prison to address Mr. Begolly's

that he left behind on the forum."  See Attachment A at 15.

-19-

treatment needs, significant resources exist within the Federal prison system to address the medical needs of Mr. Begolly and thousands of others. See Attachment I, Letter from BOP, along with BOP Program Statement P5330.11 and 5310.12. Furthermore, as outlined in DiMarzio's report, Begolly's previous treatment while outside the justice system and under the care of his parents in the days, months, and years leading up to the date of his arrest can be described as inconsistent at best. As DiMarzio's report states that "structure in [Begolly's] environment" is important, a term of imprisonment, if nothing else, provides that structure. See DiMarzio Report at 23. Therefore, disregarding the Federal prison system's resources to both protect the public and reform the Defendant's behavior while providing the Defendant with consistent structure and treatment, in an effort to mitigate the Defendant's sentence for a serious offense for which his mental condition cannot be blamed for, would result in a sentence that inadequately addresses all of the 3553(a) factors. As such, the agreed-upon sentence of 180 months imprisonment adequately satisfies all of these goals, and thus, the plea agreement of the parties should be accepted by this Court.

Wherefore, the Government respectfully requests this Court to find that a sentence of 180 months imprisonment satisfies the sentencing factors of 18 U.S.C. §3553(a), ███████████, and accept the plea agreement of the parties pursuant to Rule 11(c)(1)(C) of the

Federal Rules of Criminal Procedure.

Respectfully submitted,

DAVID J. HICKTON
United States Attorney

By:  s/James T. Kitchen
     JAMES T. KITCHEN
     Assistant U.S. Attorney
     PA ID No. 308565
     U.S. Attorney's Office
     U.S. Post Office & Courthouse
     700 Grant Street, Suite 4000
     Pittsburgh, PA  15219
     Office:  412-644-3500
     Fax:  412-644-2645
     jimmy.kitchen@usdoj.gov